UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

Civil Action No. 4:12-cv-40022

| | |
|---|---|
| SUSAN J. TRAINOR | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| MONTACHUSETT REGIONAL | ) |
| TRANSIT AUTHORITY, | ) |
| KAREN CORDIO AND | ) |
| DONNA LANDRY, | ) |
| Defendants | ) |

**COMPLAINT AND JURY DEMAND**

**Introduction**

1.      Plaintiff was an employee of Defendants and had, at all relevant times, disabilities that were well-known to Defendants.  Plaintiff was, at all relevant times, a qualified individual with a disability under the Americans With Disabilities Act, 42 U.S.C. §§ 12101, *et seq.* (the "ADA") and M.G.L. c. 151B, and Plaintiff was further entitled to the benefits and protections of the Federal Family And Medical Leave Act ("FMLA.") Plaintiff's claims herein arise out of Defendants' failure to allow Plaintiff the leave to which she was entitled under the FMLA, failure and refusal to accommodate Plaintiff's disability and termination of Plaintiff based on her disability in violation of the ADA, and interference with Plaintiff's rights and retaliation against her for exercising her rights under the ADA, FMLA and M.G.L. c. 151B.

1

## Parties

2.      Plaintiff Susan J. Trainor ("Susan") is an individual residing in Hubbardston, Worcester County, Massachusetts.

3.      Defendant Montachusett Regional Transit Authority ("MART") is a regional transportation authority established under Chapter 161B of the Massachusetts General Laws, and maintains a facility in Fitchburg, Worcester County, Massachusetts.

4.      The Defendant Karen Cordio ("Cordio") is, upon information and belief, an individual residing in Massachusetts.

5.      The Defendant Donna Landry ("Landry") is, upon information and belief, an individual residing in Massachusetts.

6.      MART, Cordio and Landry are collectively referred to hereinafter as the "Defendants."

## Jurisdiction And Venue

7.      Jurisdiction is proper pursuant to 28 U.S.C. § 1331 inasmuch as Susan's claims arise, in part, under the laws of the United States.

8.      Venue is proper pursuant to 28 U.S.C. § 1391 inasmuch as (i) a substantial part of the events occurred in Massachusetts and (ii) Defendants are subject to personal jurisdiction in Massachusetts.

**Factual Allegations Applicable To All Counts**

9.      MART is, and has been at all relevant times, a regional transportation authority established under M.G.L. c. 161B.  MART provides transportation services in North Central Massachusetts.  At all relevant times, MART has maintained a facility in Fitchburg, Massachusetts (the "Fitchburg Facility.")

10.      MART employed Susan as a Staff Assistant at the Fitchburg Facility from June 11, 2007 until July 12, 2011.  Susan initially worked in MART's Billing Department and was later transferred to MART's Call Center.  With the exception of times during which Susan took leave pursuant to the FMLA, Susan generally worked a daytime shift from 8:00 a.m. until 4:00 p.m., and generally worked 37.5 to 40 hours weekly.

11.      MART terminated Susan on July 12, 2011.  Immediately prior to her termination, MART paid Susan at an hourly rate of $13.89 and Susan worked as Staff Assistant in MART's Call Center at the Fitchburg Facility.

12.      At all relevant times, Cordio was the Program Manager of MART's Call Center.  While Susan worked in the Call Center, up to and including the date of her termination, Susan reported directly to Cordio.

13.      Upon information and belief, at all relevant times, including without limitation on July 12, 2011, Cordio was a managerial-level employee of MART and exercised control, on MART's behalf, over the terms and conditions of Susan's

employment with MART.  Cordio's control included without limitation the authority to terminate Susan's employment.

14.     Upon information and belief, at all relevant times, Landry was MART's Director of Operations and Human Resources.  Landry was responsible for, among other things, ensuring that MART's employees, including Cordio, complied with the ADA, FMLA and M.G.L. c. 151B.

15.     At all relevant times, including without limitation on July 12, 2011, Landry was a managerial-level employee of MART and exercised control, on MART's behalf, over the terms and conditions of Susan's employment with MART.  Landry's control included without limitation the authority to terminate Susan's employment.

16.     As described more fully below, Susan requested two separate leaves under the FMLA during her employment with MART.  The first FMLA leave occurred over a period of several months, beginning and ending in 2010 (and is hereinafter sometimes referred to as the "2010 FMLA Leave.")  Susan's second FMLA leave began in early 2011 (and is hereafter sometimes referred to as the "2011 FMLA Leave.")

17.     At least until her 2011 FMLA Leave, Susan generally received favorable annual performance reviews and raises from MART.  For instance, in her June 2008 and June 2009 reviews, she received pay increases.  On or about July 1, 2010, she received an additional increase.

18.     In January 2010, Susan was diagnosed with diabetes.  Around the same time, Susan's daughter was experiencing significant depressive symptoms.  As a result of her daughter's need for care, Susan requested and received from MART the 2010 FMLA Leave.  After exhausting her leave time in connection with the 2010 FMLA Leave, Susan resumed working Monday through Friday from 8a to 4p.

19.     By about March or April 2010, Susan began to experience frequent pain and swelling in her hands and feet.  Susan thereafter contacted her primary care provider, Kelly Hoisington, D.O. ("Dr. Hoisington") regarding the pain and swelling.  After some testing, Dr. Hoisington told Susan that he suspected rheumatoid arthritis and referred Susan to a podiatrist, Dr. Paula Fontaine ("Dr. Fontaine") and another specialist.

20.     At that time, Susan was working as a Staff Assistant in MART's Billing Center.  Around that same time, MART began requiring the Staff Assistants in the Billing Center to walk the Fitchburg Facility and collect money from the parking meters.  Because of the increasing pain and swelling in her feet, Susan asked to be excused from this newly-created requirement and provided a note from Dr. Fontaine's office regarding same.

21.     In or around the Summer of 2010, MART announced to the Billing Department Staff Assistants that one would be selected for transfer to the Call Center.  At the time, MART employed five Staff Assistants in the Billing Center, including Susan.  MART selected Susan for transfer.

22.     Upon information and belief, MART selected Susan for transfer because of her 2010 FMLA Leave and/or her prior request to be excused from walking the Fitchburg Facility to collect from the parking meters.

23.     As a result of the transfer, Susan began working as a Staff Assistant in MART's Call Center from approximately September 2010 until her termination on July 12, 2011.  While working in the Call Center, Susan reported directly to Cordio.

24.     At all relevant times, a Call Center Staff Assistant's job duties were to take calls from certain eligible recipients and assist with coordinating recipients' transportation to and from medical appointments.  At all relevant times, the Call Center was open 8a – 5p Monday through Friday.  During the time Susan worked in MART's Call Center, the number of Staff Assistants in the Call Center grew from twenty-three (23) to twenty-eight (28.)

25.     Susan subsequently consulted one Alice A. Williams, a rheumatologist (hereinafter, "Dr. Williams") in October 2010 for her ongoing symptoms, which symptoms included joint pain and swelling.  Dr. Williams confirmed Susan's diagnosis of arthritis and began treating Susan for same and related symptoms.

26.     Inflammatory arthritis is an autoimmune disorder, in which the body views its own tissues as foreign and reacts with inflammation.  In some cases – and, specifically, in Susan's case – the inflammatory arthritis is also accompanied by Irritable Bowel

Syndrome (hereinafter, "IBS.")  IBS, in turn, produces symptoms that include recurring abdominal cramps and diarrhea.

27.     For Susan, her IBS symptoms often struck without warning and, when the symptoms flared, she would be confined to a bathroom and sometimes unable to even get to a phone.  There were occasions when she left her house in the morning with plenty of time to drive to work, only to then have to find a place to stop and use a bathroom, causing her to arrive late for work.

28.     Susan attempted several strategies to avoid having the IBS symptoms cause her to miss or arrive late for work.  For instance, she tried taking her medication at different times during the day (including by waking up at or shortly after midnight.)  She tried to avoid eating or drinking anything in the morning before work (which, unfortunately, then created problems with her blood sugar level, which she had to monitor in connection with her diabetes diagnosis.)  She also tried to awake earlier in the morning so that the diarrhea would pass before she had to leave for work.  These strategies had limited success, however.

29.     By approximately November or December 2010, Cordio began criticizing Susan for being tardy.  On at least one occasion, Cordio told Susan that, if Cordio allowed Susan to arrive late, then Cordio would have to allow everyone else to come in late and people would start coming in late because they stopped at Dunkin' Donuts.  Other times, Cordio told Susan that co-employees were complaining because of Susan's tardiness.

30.     Susan continually explained to Cordio that her diagnoses and the related symptoms caused Susan's tardiness.  Also, on more than one occasion, Susan requested accommodations from Cordio.  For instance, Susan asked Cordio to allow Susan to make up time at the end of the day on the occasions when Susan's symptoms caused Susan to come in late.  Susan's hours were 8a to 4p, but the Call Center was open until 5p so there was a window at the end of the day where she could make up the time.  Cordio initially granted Susan this accommodation, allowing Susan to make up time at the end of the days on which she arrived late.  As explained below, however, this accommodation was short-lived.

31.     By late 2010, MART was advertising different positions internally, including a position in the Scheduling Department and as Supervisor of the Call Center, which positions Susan applied for.  MART filled these positions with other employees.  MART considered Susan's attendance and tardiness as factors in not selecting Susan for these positions, although MART was aware of Susan's diagnoses and requested accommodations.

32.     At one point in late 2010 or early 2011, either Landry or Cordio told Susan that she would have to apply for leave under the FMLA in connection with the absences and/or tardiness caused by Susan's symptoms, telling Susan that she was running out of sick or vacation time to use when her symptoms required her to take time off.

33.     In the meantime, sometime in January or February 2011, Susan was moved to the "greeter's desk" in the Call Center.  The "greeter's desk" is the position in which one of the Call Center Staff Assistant's is responsible for greeting walk-in customers and buzzing employees into the Call Center (which was a locked room at the Fitchburg Facility.)  Being at this desk exposed Susan to more people, caused Susan's symptoms to worsen and caused her to become ill more often -- likely because the arthritis prescriptions weakened her immune system.

34.     Susan told Cordio that being seated at the "greeter's desk" was exacerbating Susan's symptoms, and that Susan did not want to become sick more frequently and miss work.  Consequently, Susan asked Cordio if she (Susan) could be moved off of the "greeter's desk."  Cordio initially said she would consider Susan's request.

35.     On January 21, 2011, Dr. Williams faxed to one of MART's Call Center Supervisors a certification explaining Susan's inflammatory arthritis, the secondary IBS and the manner in which those conditions impacted Susan.  A copy of the faxed certification is attached hereto as Exhibit A.

36.     On January 24, 2011, MART approved Susan to take leave under the FMLA (which leave is sometimes hereinafter referred to as the "2011 FMLA Leave.")  A true and complete copy of said approval is attached hereto as Exhibit B.

37.     Despite MART's January 24, 2011 approval, Cordio gave Susan a verbal warning on January 26, 2011 for what Cordio characterized as "consistent tardiness."  A true and complete copy of Cordio's January 26, 2011 memorandum to Susan concerning said verbal warning is attached hereto as Exhibit C.

38.     When Cordio issued the January 26, 2011 warning to Susan, Cordio knew that (i) Susan's medical issues were causing the tardiness, and (ii) Susan believed that her FMLA approval would "cover" her for tardiness.  Cordio did not, however, engage further dialogue with Susan regarding a possible accommodation.  Instead, Cordio took the position that Susan must arrive precisely at 8:00 a.m. daily because Susan's "FMLA form does not indicate that you must be late for work every day."

39.     On January 27, 2011, Susan spoke to Landry about the 2011 FMLA Leave and Susan's tardiness.  Landry said that the then-approved leave did not "cover [Susan's] tardies."

40.     On January 28, 2011, Landry sent Susan a memo indicating that the need to use the previously-approved FMLA leave to arrive to work late or leave early was not consistent with what Dr. Williams provided in her certification.  Landry further requested that Dr. Williams clarify the details of Susan's leave.  A true and complete copy of Landry's January 28, 2011 memo to Susan is attached hereto as Exhibit D.

41.     Susan complied with Landry's request by obtaining a February 10, 2011 note from Dr. Williams, clarifying that the symptoms related to the IBS and arthritis may cause Susan to be late to work, leave work early and also require absence from work for up to three days per week.  A true and complete copy of the February 10, 2011 note is attached hereto as Exhibit E.

42.     On or shortly after February 10, 2011, MART accepted the above-referenced note and approved Susan's use of leave under the FMLA for occasions when her symptoms and/or medical treatment caused Susan to arrive late for work, leave early from work or miss a day of work.

43.     Cordio's reaction was swift.  Shortly after receiving the clarification from Dr. Williams, Cordio told Susan that she (Susan) would no longer be allowed to stay later in the day to make up time that she missed in the morning (instead forcing Susan to use FMLA-designated time.)  At the same time, Cordio denied Susan's prior request to move her desk.  Shortly thereafter, when Susan again requested (at her doctor's advice) that MART allow her to move her desk, Cordio told Susan to put her request in writing.

44.     On March 4, 2011, after Susan requested same in writing, Cordio allowed Susan to move her desk.  On the exact same day, however, Cordio told Susan that she must call to inform Cordio (who would not even be there to answer the call) on each morning that Susan was using FMLA-designated leave, even if Susan were only one minute late (a condition not applied to other similarly-situated employees and even

11

though Susan was already calling in on the mornings that she would be more than a few minutes late.) Cordio also told Susan that she must explicitly reference "FMLA" when she called in. Otherwise, according to Cordio, Susan would be disciplined. Also on March 4, 2011, Cordio placed a written warning in Susan's file for a "scheduling error" that MART alleged occurred nine days earlier.

45.     Four days later, on March 8, 2011, Cordio issued another written warning to Susan. A true and complete copy of the March 8, 2011 written warning is attached hereto as Exhibit F.

46.     Susan tried, on many occasions including on March 8th, to explain to Cordio that there were days when Susan literally could not get to a phone to call, as well as days when Susan was late without calling before 8a because she had an accident on the way to work and soiled her pants.

47.     Cordio responded by telling Susan "if you have a problem with how I am handling this, then go talk to Cheryl" (referring to Cheryl Montouri, one of MART's supervisors and hereinafter referred to as "Ms. Montouri.") When Susan spoke to Ms. Montouri, Susan became very emotional and told Ms. Montouri that she (Susan) felt like she was buckling under the pressure that Cordio was placing on her. Ms. Montouri told Susan to "just keep calling." Susan asked Ms. Montouri about a reassignment to another department, such as back to the Billing Center. Ms. Montouri told Susan that no position was available.

48.     On April 6, 2011 Susan received an additional written warning from Cordio. A true and complete copy of the April 6, 2011 written warning is attached hereto as Exhibit G.

49.     Susan told Cordio, again, that there were days when she literally could not get off of the toilet or days when she was driving to work and had to look for a place to go to the bathroom.  Cordio told Susan to call her every single day before she left the house. Susan questioned Cordio as to what would happen to her when the 2011 FMLA leave expired (that is, the leave Susan was using when she was coming in late.)  Cordio responded that Susan would be terminated the very first time she was late.  Susan then began to cry.  Cordio responded by telling Susan that she (Susan) was unprofessional and had to get her emotions under control.

50.     From that point until her termination on July 12, 2011, Susan called MART daily and left a message for Cordio (because Cordio was not there before 8a to take Susan's call) to say that Susan was leaving her house.

51.     Some point after Susan received the April 6th warning, Susan contacted Landry and spoke to her by phone.  Susan told Landry that she knew the 2011 FMLA leave was expiring, and asked about MART thereafter providing an accommodation to Susan in light of her medical issues.  Landry said she would look into this and respond to Susan.

52.     By email dated May 27, 2011, Susan told Landry that she (Susan) was concerned that Cordio would terminate Susan as soon as the 2011 FMLA Leave expired, and asked Landry to consider providing Susan an accommodation.  A true and complete copy of Susan's May 27, 2011 email to Landry is attached hereto as Exhibit H.

53.     By email dated June 1, 2011, Landry responded by suggesting to Susan that she change her work hours from 8:30a to 4:30p or 9:00a to 5:00p.  Susan, in turn, responded by telling Landry, among other things, that Susan was able to do this except on those days when she needed to leave earlier for medical appointments.  A true and complete copy of the aforementioned email exchange between Susan and Landry is attached hereto as Exhibit I.

54.     By email dated July 6, 2011, Landry provided Susan's FMLA balances to her (as of June 17, 2011) and further stated that MART would work with Susan to accommodate her after the FMLA leave expired.

55.     Other than the July 6, 2011 email referred to above, Landry did not (i) attempt after June 1, 2011 to discuss accommodations with Susan or (ii) otherwise respond to Susan's June 1, 2011 email.

56.     By email dated Monday, July 11, 2011, Susan responded to Landry's July 6th email, informing Landry that she (Susan) *"was told none [sic] ever told Karen [Cordio] or Cheryl [Montouri] what would happen when the fmla ran out.  Also at this point when I am out I am required to write fmla, when this runs how [sic], how is it to appear on my time sheets?  Do I*

*write disability??"* A true and complete copy of Landry's July 6, 2011 email to Susan, and

Susan's July 11, 2011 response to Landry, are attached hereto as Exhibit J.

57.     Landry did not respond to Susan's July 11, 2011 email.

58.     On Tuesday, July 12, 2011, MART terminated Susan's employment, claiming

that she was tardy on July 8th and failed to call in.  Landry, Cordio, and one Rebecca

Bagley – along with Susan -- attended the July 12th termination meeting.  Before leaving

the July 12th meeting, Susan said that she was certain she had called in on July 8th and

asked that someone re-check the phone records.  Landry refused to do so, instead telling

Susan that she (Landry) was "not going to argue" with Susan.  Attached hereto as Exhibit

K is a true and complete copy a July 12, 2011 letter Susan received from MART regarding

her termination.

59.     Landry then escorted Susan to her desk.  While watching Susan pack her

personal belongings, Landry repeated to Susan "don't take anything that belongs to

MART."  After retrieving her personal belongings, Susan left her workstation, but did not

make it out of the building before she broke down in tears.

60.     Despite MART's assertions, Susan called MART on July 8, 2011 from her

home and cell phones at 7:17 a.m. and 8:39 a.m., respectively.

61.     At the time of her termination, Susan had not exhausted the 2011 FMLA

Leave.

62.     At all relevant times, including without limitation on July 12, 2011, Susan was a "qualified individual with a disability" under the ADA.

63.     At all relevant times, including without limitation on July 12, 2011, Susan was entitled to the benefits and protections of the FMLA.

64.     By virtue of her written and verbal communications with MART, as alleged above, MART knew and/or reasonably should have known that Susan's arthritis, diabetes and IBS diagnoses, and the related symptoms, were the reasons for her absences from work, tardiness and/or inability to call Cordio at certain times.  These communications, as alleged above, either individually and/or collectively triggered MART's obligation to engage in a dialogue with Susan to attempt to identify a means to reasonably accommodate Susan's diagnoses and related symptoms.

65.     Defendants failed to engage in a dialogue sufficient to determine a reasonable accommodation for Susan's disabilities, failed and refused to accommodate Susan's disabilities and terminated Susan because of those disabilities and/or because of her requests for accommodations, her internal complaints regarding MART's failure to provide accommodations, and/or use of FMLA leave.

66.     Susan's requests to Defendants for accommodations, requests for and use of leave under the FMLA, and Susan's internal complaints regarding MART's compliance with the FMLA and failure to provide accommodations, as alleged above, constitute activity protected from retaliation and/or interference.

67.     At all relevant times, Susan acted in good faith and was reasonable in the requests she made to Defendants, and acted with a good-faith belief that MART's conduct was unlawful.

68.     After July 12, 2011, Susan's position remained open and MART sought to fill that position with a replacement.

69.     MART's, Landry's and Cordio's violations of the ADA, FMLA and M.G.L. c. 151B have caused Susan to suffer damage, including without limitation to lost wages and emotional distress.

70.     On or about October 21, 2011, Susan filed Charges with the Massachusetts Commission Against Discrimination and the Equal Employment Opportunity Commission regarding the above-referenced allegations.

71.     By letters dated December 22, 2011 and February 24, 2012, Susan received from the Commissions permission to commence the within civil action.

## COUNT I

### (Violation of M.G.L. c. 151B - Termination On The Basis Of Handicap – Against All Defendants)

72.     Susan restate and incorporate herein by reference the allegations set forth in paragraphs 1 through 71 above.

73.     At all relevant times, Susan was a "handicapped person," as that term is defined by M.G.L. c. 151B, §§ 1(17) and 1(19).

74.     At all relevant times, Susan was able, with reasonable accommodations, to perform the essential functions of her job.  Said reasonable accommodations included, without limitation, one or more of the following (i) allowing Susan to intermittently make up time at the end of a workday, or within a reasonable time thereafter, when medical conditions or medical appointments caused her to arrive late to work or otherwise miss time from work, (ii) allowing Susan intermittent unpaid time off beyond the expiration of, or in place of, leave permitted under the FMLA when medical conditions or medical appointments caused Susan to arrive late to work or otherwise miss time from work, and/or (iii) modifying its call-in policy with respect to Susan to accommodate occasions when her symptoms prevented complying with said policy.

75.     On July 12, 2011, MART terminated Susan's employment.

76.     MART's termination of Susan's employment was motivated, at least in part, by Susan' handicaps.

77.     After MART terminated Susan, Susan's position remained open and MART sought to fill that position and/or hired a replacement for Susan's position.

78.     As a result of MART's termination of Susan, Susan has suffered substantial injury and damage.

18

## COUNT II

### (Violation of M.G.L. c. 151B – Failure To Provide Reasonable Accommodation – Against All Defendants)

79.     Susan restate and incorporate herein by reference the allegations set forth in paragraphs 1 through 78 above.

80.     At all relevant times, Susan was a "handicapped person," as that term is defined by M.G.L. c. 151B, §§ 1(17) and 1(19).

81.     At all relevant times, Susan was able, with reasonable accommodations, to perform the essential functions of her job.  Said reasonable accommodations included, without limitation, one or more of the following (i) allowing Susan to intermittently make up time at the end of a workday, or within a reasonable time thereafter, when medical conditions or medical appointments caused her to arrive late to work or otherwise miss time from work, and/or (ii) allowing Susan intermittent unpaid time off beyond the expiration of, or in place of, leave permitted under the FMLA when medical conditions or medical appointments caused Susan to arrive late to work or otherwise miss time from work and/or (iii) modifying its call-in policy with respect to Susan to accommodate occasions when her symptoms prevented complying with said policy.

82.     Defendants could have provided reasonable accommodations to Susan, including without limitation the accommodations noted in the above paragraph, without posing an undue hardship to MART's business.

83.     When Susan was terminated, Defendants knew of Susan's handicaps.

84.     When Susan was terminated, Defendants knew that Susan needed reasonable accommodations in order to perform the essential functions her job.

85.     At various times before June 12, 2011, Susan requested reasonable accommodations from Defendants.

86.     At various times before June 12, 2011, Susan triggered Defendants' obligation to engage in a dialogue with Susan to determine whether a reasonable accommodation was available that would have allowed Susan to perform the essential functions of her job.

87.     Defendants failed to engage in a dialogue with Susan and/or undertake a reasonable investigation to identify a means to reasonably accommodate Susan's handicaps.

88.     Defendants failed and refused to provide a reasonable accommodation to Susan's handicaps.

89.     As a result of Defendants' failure to accommodate Susan's handicaps, Susan has suffered substantial injury and damage.

## COUNT III

### (Violation of Americans With Disabilities Act –
### Termination On The Basis Of Disability –
### Against MART only)

90.     Susan restates and incorporates herein by reference the allegations set forth in paragraphs 1 through 89 above.

91.     At all relevant times, Susan had a "disability," as that term is defined by 42 U.S.C. § 12102(1).

92.     At all relevant times, Susan was able, with reasonable accommodations, to perform the essential functions of her job.  Said reasonable accommodations included, without limitation, one or more of the following (i) allowing Susan to intermittently make up time at the end of a workday, or within a reasonable time thereafter, when medical conditions or medical appointments caused her to arrive late to work or otherwise miss time from work, and/or (ii) allowing Susan intermittent unpaid time off beyond the expiration of, or in place of, leave permitted under the FMLA when medical conditions or medical appointments caused Susan to arrive late to work or otherwise miss time from work and/or (iii) modifying its call-in policy with respect to Susan to accommodate occasions when her symptoms prevented complying with said policy.

93.     On July 12, 2011, MART terminated Susan's employment.

94.     MART's termination of Susan's employment was motivated, at least in part, by Susan's disabilities.

95.     After MART terminated Susan, Susan's position remained open and MART sought to fill that positions and/or hired replacements for Susan's position.

96.     As a result of MART's termination of Susan, Susan has suffered substantial injury and damage.

21

## COUNT IV

## (Violation of Americans With Disabilities Act –
### Failure To Provide Reasonable Accommodation –
### Against MART Only)

97.     Susan restates and incorporates herein by reference the allegations set forth in paragraphs 1 through 96 above.

98.     At all relevant times, Susan had a "disability," as that term is defined by 42 U.S.C. § 12102(1).

99.     At all relevant times, Susan was able, with reasonable accommodations, to perform the essential functions of her job.  Said reasonable accommodations included, without limitation, one or more of the following (i) allowing Susan to intermittently make up time at the end of a workday, or within a reasonable time thereafter, when medical conditions or medical appointments caused her to arrive late to work or otherwise miss time from work, and/or (ii) allowing Susan intermittent unpaid time off beyond the expiration of, or in place of, leave permitted under the FMLA when medical conditions or medical appointments caused Susan to arrive late to work or otherwise miss time from work and/or (iii) modifying its call-in policy with respect to Susan to accommodate occasions when her symptoms prevented complying with said policy.

100.     Defendants could have provided reasonable accommodations to Susan, including without limitation the accommodations noted in the above paragraph, without posing an undue hardship to MART's business.

22

101.    When Susan was terminated, Defendants knew of Susan's handicaps.

102.    When Susan was terminated, Defendants knew that Susan needed reasonable accommodations in order to perform the essential functions her job.

103.    At various times before June 12, 2011, Susan requested reasonable accommodations from Defendants.

104.    At various times before June 12, 2011, Susan triggered Defendants' obligation to engage in a dialogue with Susan to determine whether a reasonable accommodation was available that would have allowed Susan to perform the essential functions of her job.

105.    Defendants failed to engage in a dialogue with Susan and/or undertake a reasonable investigation to identify a means to reasonably accommodate Susan's handicaps.

106.    Defendants failed and refused to provide a reasonable accommodation to Susan's handicaps.

107.    As a result of Defendants' failure to accommodate Susan's handicaps, Susan has suffered substantial injury and damage.

## COUNT V

### (Violations of M.G.L. c. 151B, §§ 4(4) and 4(4A) – Interference With Protected Rights and Retaliation For Requesting Reasonable Accommodation – Against All Defendants)

108.    Susan restates and incorporates herein by reference the allegations set forth in paragraphs 1 through 107 above.

109.    Susan's requests to Defendants for accommodations, and her internal complaints regarding MART's failure to provide accommodations, as alleged above, constitute activity protected from retaliation and/or interference under M.G.L. c. 151B, §§ 4(4) and 4(4A.)

110.    At all relevant times, Susan acted in good faith and was reasonable in the requests she made to Defendants, and acted with a good-faith belief that MART's conduct in failing to provide reasonable accommodations was unlawful.

111.    Defendants terminated Susan's employment on July 12, 2011.

112.    Defendants' conduct as alleged herein, including without limitation Defendants' termination of Susan on July 12, 2011, constitutes adverse employment action against Susan.

113.    Susan's protected activity, as alleged herein, was known to Defendants and was a determinative factor in Defendants' decision to take adverse employment action against Susan, including without limitation Defendants' termination of Susan on July 12, 2011.

114.     As a result of Defendants' violations, Susan has suffered substantial injury and damage.

## COUNT VI

### (Violations of 42 U.S.C., §§ 12203(a),(b) – Interference With Protected Rights and Retaliation For Requesting Reasonable Accommodation – Against MART Only)

115.     Susan restates and incorporates herein by reference the allegations set forth in paragraphs 1 through 114 above.

116.     Susan's requests to Defendants for accommodations, and her internal complaints regarding MART's failure to provide accommodations as alleged above, constitute activity protected from retaliation and/or interference under 42 U.S.C., §§ 12203(a),(b).

117.     At all relevant times, Susan acted in good faith and was reasonable in the requests she made to Defendants and acted with a good-faith belief that MART's conduct in failing to provide reasonable accommodations was unlawful.

118.     Defendants terminated Susan's employment on July 12, 2011.

119.     Defendants' conduct as alleged herein, including without limitation Defendants' termination of Susan on July 12, 2011, constitutes adverse employment action against Susan.

120.     Susan's protected activity, as alleged herein, was known to Defendants and was a determinative factor in Defendants' decision to take adverse employment action against Susan, including without limitation Defendants' termination of Susan on July 12, 2011.

121.     As a result of MART's violations, Susan has suffered substantial injury and damage.

## COUNT VII

### (Violations of 29 U.S.C. §§ 2612, 2614 –Failure To Comply With FMLA Leave And Restoration Provisions – Against All Defendants)

122.     Susan restates and incorporates herein by reference the allegations set forth in paragraphs 1 through 121 above.

123.     At all relevant times, including without limitation on July 12, 2011, Cordio and Landry were managerial-level employees of MART and exercised control, on MART's behalf, over the terms and conditions of Susan's employment with MART.  Said control included without limitation the authority to terminate Susan's employment.

124.     At all relevant times, including without limitation on July 12, 2011, Susan was an eligible employee of MART, as the term "eligible employee" is defined pursuant to 29 U.S.C. § 26l1(2)(a).

125.     At all relevant times, including without limitation on July 12, 2011, Susan was entitled to the benefits and protections of the FMLA, including without limitation (i) the right to take up to twelve weeks of intermittent leave in 2011 and (ii) upon the

conclusion of that leave, to be restored to the same or an equivalent position with no loss of benefits.

126.    At all relevant times, including without limitation on July 12, 2011, Defendants were "employers" as the term "employer" is defined pursuant to 29 U.S.C. § 26l1(4).

127.    When Susan was terminated on July 12, 2011, she had not exhausted the FMLA leave to which she was entitled in 2011.

128.    By terminating Susan on July 12, 2011, Defendants denied Susan the full benefits to which she was entitled under the FMLA.

129.    As a result of Defendants' violations, Susan has suffered substantial injury and damage.

## COUNT VIII

### (Violations of 29 U.S.C. §§ 2615(a)(1) and (a)(2) – Interference With And/Or Retaliation Against Exercise of Rights Protected Under FMLA – Against All Defendants)

130.    Susan restates and incorporates herein by reference the allegations set forth in paragraphs 1 through 129 above.

131.    At all relevant times, including without limitation on July 12, 2011, Cordio and Landry were managerial-level employees of MART and exercised control, on MART's behalf, over the terms and conditions of Susan's employment with MART.  Said control included without limitation the authority to terminate Susan's employment.

132.    At all relevant times, including without limitation on July 12, 2011, Susan was an eligible employee of MART, as the term "eligible employee" is defined pursuant to 29 U.S.C. § 26l1(2)(a), and was further entitled to the benefits and protections of the FMLA.

133.    At all relevant times, including without limitation on July 12, 2011, Defendants were "employers" as the term "employer" is defined pursuant to 29 U.S.C. § 26l1(4).

134.    Susan's requests for and use of leave under the FMLA, both in 2010 and 2011, as well as Susan's internal complaints regarding MART's compliance with the FMLA, constitute activity protected from retaliation and/or interference under 29 U.S.C. § 2615(a)(1),(2).

135.    At all relevant times, Susan was reasonable in the requests she made to Defendants, and acted with a good-faith belief that MART's conduct was not in compliance with the FMLA.

136.    Defendants terminated Susan's employment on July 12, 2011.

137.    Defendants' conduct as alleged herein, including without limitation Defendants' termination of Susan on July 12, 2011, constitutes adverse employment action against Susan.

138.    Susan's protected activity, as alleged herein, was known to Defendants and was a determinative factor in Defendants' decision to take adverse employment action against Susan, without limitation Defendants' termination of Susan on July 12, 2011.

28

139.    As a result of Defendants' violations, Susan has suffered substantial injury and damage.

## JURY DEMAND

Plaintiff Susan J. Trainor requests a jury trial on all issues so triable.

WHEREFORE, Plaintiff Susan J. Trainor respectfully requests that this Court grant the following relief:

1.    Enter judgment in Plaintiff's favor as to all Counts of the Complaint and award Susan all damages directly and proximately thereby;

2.    Award Plaintiff interest, punitive damages, attorneys' fees and costs; and

3.    Award Susan all other and further relief that this Court deems just.

SUSAN J. TRAINOR,

By their attorney,

_____

/s/ Janie Lanza Vowles
BBO No. 637022
LAW OFFICE OF JANIE LANZA VOWLES, P.C.
12 Main Street
Leominster, MA  01453
Phone: 978/ 534-9771, Fax: 978/534-9778
Dated:  February 27, 2012        Email: jvowles@jlvlaw.com